[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-14485
Non-Argument Calendar
_____

Agency No. A206-028-757


ESPILVIO RAMIRO SANCHEZ-BENAVIDEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(May 16, 2017)

Before ED CARNES, Chief Judge, JULIE CARNES, and JILL PRYOR, Circuit
Judges.

PER CURIAM:

Espilvio Sanchez-Benavidez filed a petition for review of the Board of

Immigration Appeals' denial of his applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. Sanchez-Benavidez contends (1) the BIA's decision was not supported by substantial evidence, (2) that the BIA and IJ were biased and discriminated against him on account of his social status, and (3) that the Board of Immigration Appeals abused its discretion by denying his motion to remand his case to the Immigration Judge for reconsideration in light of additional evidence.

I.

Sanchez-Benavidez is a young man in his twenties from Chinandega, Nicaragua. He entered the United States in July 2013 without being admitted or paroled after inspection by an immigration officer. Before entering the United States, he resided with his grandmother, who remains at her home in Nicaragua. Before the IJ, Sanchez-Benavidez testified that he applied for asylum because "the Sandinista[1] organization has tried to kill" him. He admitted removability, but sought asylum, withholding of removal, and CAT relief.

A.

According to Sanchez-Benavidez's testimony and application for asylum,

---

[1] A Sandinista is "[a] member or advocate of the leftist political party that governed Nicaragua from 1970 to 1990." Sandinista, Am. Heritage Dictionary (5th ed. 2016). "Sandinista leader Daniel Ortega was reelected as president [of Nicaragua] in 2006, 2011, and 2016." Sandinista, Britannica Academic, Encyclopædia Britannica (Nov. 8, 2016), http://academic.eb.com/levels/collegiate/article/Sandinista/65474.

2

his family has a long history of being persecuted by the Sandinistas.  Three of his uncles were killed by the Sandinistas — two were killed in 1979 and one was killed in 1980.  Though they were killed before Sanchez-Benavidez was born, he learned of their deaths from his grandmother.  His grandmother also told him that another uncle had received political asylum in Mexico; Sanchez-Benavidez's asylum application asserts that this uncle fled to Mexico after he was threatened by Sandinista officers.  His asylum application also asserts that a fifth uncle was "wounded" by Sandinista officers in 1986 after which he fled to Costa Rica.  According to his application, all of those uncles were accused of being fighters for the Sandinistas' enemies, the Contras.

Sanchez-Benavidez's father was suspected of collaborating with the Contras and detained by the Sandinistas several times before leaving Nicaragua in 1987.  His father currently lives in El Salvador.  Sanchez-Benavidez has brothers and sisters who have moved to Costa Rica because they were threatened or accosted by the Sandinistas, though they had never been harmed in Nicaragua.

Sanchez-Benavidez's grandmother is also against the Sandinistas.  The Sandinistas throw rocks at her house and "criticize" her, calling her an "anti-revolutionary."  They also draw graffiti on the house.  The graffiti says "damned" or "you're damned anti-Sandinistas, anti-revolutionary" and has included skeletons.  When the Sandinistas vandalize Sanchez-Benavidez's grandmother's

3

house, they do so as a "mob" during "marches."  No one has been hurt on those occasions.

## B.

Moreover, Sanchez-Benavidez himself has experienced harassment and was involved in anti-Sandinista activity in Nicaragua.  He said that, around 2006, the Sandinistas began to call him "anti-Sandinista' and "anti-revolutionary" and would "insult [him] very harshly."

When he was eighteen, Sanchez-Benavidez joined the Independent Liberal Party, which is opposed to the Sandinistas.  And he was the leader of a youth group for the party, organizing meetings to talk about democracy or human rights. Sanchez-Benavidez made his support for free elections and human rights publicly known.  And he testified that the Sandinistas consider him to be a counter-revolutionary and anti-Sandinista because he has the same political views that his uncles did.

As a result of his work with the Independent Liberal Party, he received threats from the Sandinista youth group in May or June 2013.  According to Sanchez-Benavidez:  "They would say you damn dog, we're going to screw you up, the same thing that happened to your uncle is going to happen to you."  He testified that "the very strong threats" he was receiving are what prompted him to flee Nicaragua.  Sanchez-Benavidez explained that he was targeted because the

4

Sandinistas wanted to take advantage of his leadership position with the youth group and wanted to force him to join their group. They told him that, if he didn't join, the same thing that happened to his uncles would happen to him. They also offered him money to join, which he refused.

Sanchez-Benavidez also testified that, once the Sandinistas threatened him, he didn't wait around for them to threaten him many times. Knowing what had happened to his uncles, he left the country after they had threatened him two or three times within a two-week period. He fears the Sandinistas would kill, torture, or imprison him if he returns to Nicaragua. Sanchez-Benavidez also testified that he could not relocate within Nicaragua because it was a small country and he would be located very quickly. He explained that the Sandinistas would communicate through email to find him.

Sanchez-Benavidez did not provide any documentation of his membership in the Independent Liberal Party or of his role as a youth group leader. Nor did he provide any letters or affidavits from his mother or grandmother supporting his application. Nor did he provide any proof that his uncles had been killed, imprisoned, or tortured.

## C.

The IJ found Sanchez-Benavidez's testimony credible, but denied his application for relief. He first concluded that Sanchez-Benavidez had failed to

provide adequate corroboration for his story, placing particular emphasis on his failure to obtain letters from his mother or grandmother confirming his story and his failure to provide death certificates for his uncles.  The IJ also noted that Sanchez-Benavidez did not provide a State Department Country Report for Nicaragua, which would have described political conditions in that country.

Next, the IJ found that even if Sanchez-Benavidez had provided corroborating evidence, he would not have granted relief because Sanchez-Benavidez had failed to establish past persecution or a well-founded fear of future persecution.  He emphasized that mere threats and harassment do not amount to persecution, Sanchez-Benavidez had not been physically harmed, and his grandmother continued to live unharmed in her home in Nicaragua.  He concluded that, although Sanchez-Benavidez's uncles may have been killed by Sandinistas, that was not sufficient to establish his eligibility for relief.  They were killed well before he was born and their deaths could not be considered persecution of Sanchez-Benavidez.  The IJ also noted that Sanchez-Benavidez failed to show that he had "ever sought police protection or that the government [was] unwilling or unable to protect him."

Additionally, the IJ was not persuaded that Sanchez-Benavidez was targeted because of his political affiliation.  He suggested the Sandinistas might have targeted Sanchez-Benavidez because of his leadership position in the Independent

6

Liberal Party youth group and their desire to recruit him.

Finally, the IJ concluded that Sanchez-Benavidez did not provide enough evidence to show that he was unable to safely relocate within Nicaragua. The IJ was not persuaded by his claims that the Sandinistas could locate him using email, noting that he "simply has not met his burden of establishing to the Court's satisfaction that he is a person of high enough stature or standing that people would continue to look for him if he returned to Nicaragua . . . ."

As for Sanchez-Benavidez's CAT claim, the IJ noted that he failed to identify any government officials who would be in the position to torture him or inclined to do so. The IJ noted that Sanchez-Benavidez failed to mention any government officials at all in his testimony.

### D.

Sanchez-Benavidez appealed the IJ's decision to the BIA. In addition to challenging the substance of the IJ's decision, he claimed the IJ was biased and discriminatory. He also provided the BIA with an affidavit from his mother corroborating most of his story.

The BIA adopted and affirmed the IJ's judgment. The BIA, like the IJ, based its decision on Sanchez-Benavidez's failure to (1) provide adequate corroboration, (2) establish past persecution, (3) establish that any subjective fear of future persecution was objectively reasonable, and (4) establish that relocation

within Nicaragua was not viable. It also concluded that Sanchez-Benavidez failed to "meaningfully contest[ ]" the denial of his claim for CAT relief and, as a result, had waived that issue.

Construing the submission of his mother's affidavit as a motion for a remand for further consideration, the BIA concluded that remand was not warranted. It held that Sanchez-Benavidez failed to demonstrate that the affidavit could not have been "obtained or discovered" before the IJ issued his decision.

Finally, the BIA rejected Sanchez-Benavidez's claim that the IJ was biased. It concluded it was appropriate for the IJ to consider whether Sanchez-Benavidez "was of such notoriety that it was unreasonable for him to internally relocate to avoid persecution" and that he "had a full opportunity to present his claim."

Sanchez-Benavidez petitions this Court for review of the BIA's decision.

II.

Before reaching the merits of Sanchez-Benavidez's petition, we consider whether we have jurisdiction to consider his CAT claim. The government contends that we do not, because he failed to exhaust those arguments before the BIA.

"We lack jurisdiction to review final orders in immigration cases unless 'the alien has exhausted all administrative remedies available to the alien as of right.'" Indrawati v. U.S. Att'y Gen., 779 F.3d 1284, 1297 (11th Cir. 2015) (quoting 8

8

U.S.C. § 1252(d)(1)). "A petitioner fails to exhaust h[is] administrative remedies with respect to a particular claim when [he] does not raise that claim before the BIA." Id. We will not consider a claim to have been raised before the BIA unless the petitioner argued there the "core issue now on appeal[;]" simply making "[u]nadorned, conclusory statements" is not sufficient. Id. (quotation marks omitted).

In his brief to the BIA, Sanchez-Benavidez made only passing reference to his claim for CAT relief. He mentioned CAT relief only when describing the sorts of relief he had applied for and the sorts of relief the IJ had denied him. Moreover, he mentioned the Nicaraguan government itself only three times. First, he mentioned that the "country" when "under Sandinista rul[e]" had a "history of persecuting people in circumstances similar to" Sanchez-Benavidez's. Second, he discussed the violent way that the Sandinistas took power in the late 1970s and early 1980s. Finally, he mentioned that opponents of the Sandinistas do not go to the police because the police will not protect them and will sometimes punish them. All of those statements were made not to support an argument for CAT relief, but to refute the IJ's findings as to his asylum and withholding of removal applications. As the BIA concluded, none of that was sufficient to raise the issue of CAT relief before the BIA. For that reason, Sanchez-Benavidez's claim to CAT relief is unexhausted and we have no jurisdiction to consider it. See id.

9

III.

Sanchez-Benavidez contends (1) that substantial evidence did not support the BIA's denial of his applications for asylum and withholding of removal, (2) that the BIA abused its discretion by failing to remand his case to the IJ in light of his mother's affidavit, and (3) that the BIA and IJ were biased and discriminated against him based on his social status. We are not persuaded.

A.

We turn first to Sanchez-Benavidez's applications for asylum and withholding of removal. One of the reasons the IJ and the BIA concluded that Sanchez-Benavidez was not eligible for asylum was that he had failed to demonstrate either past persecution or a well-founded fear of future persecution. He contends that conclusion was not supported by substantial evidence.

"Where the BIA issues a decision, we review that decision, except to the extent that it expressly adopts the IJ's opinion." Chen v. U.S. Att'y. Gen., 463 F.3d 1228, 1230 (11th Cir. 2006). "Insofar as the BIA adopts the IJ's reasoning, we review the IJ's decision as well." Id. In this case, the BIA issued its own opinion and adopted the IJ's opinion, so we review both opinions to the extent that the IJ's opinion is not duplicated by the BIA's.

"We review the BIA's factual determinations under the substantial evidence

test." <u>Min Yong Huang v. Holder</u>, 774 F.3d 1342, 1344 (11th Cir. 2014). "Under this test, we must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." <u>Id.</u> (quotation marks omitted). "To reverse the [BIA's] fact findings, [this Court] must find that the record not only supports reversal, but compels it." <u>Rodriguez-Morales v. U.S. Att'y Gen.</u>, 488 F.3d 884, 890 (11th Cir. 2007) (alterations in original) (quotation marks omitted). "[O]nly in a rare case does the record <u>compel</u> the conclusion that an applicant for asylum suffered past persecution or has a well-founded fear of future persecution." <u>Silva v. U.S. Att'y Gen.</u>, 448 F.3d 1229, 1239 (11th Cir. 2006) (emphasis added). This is not such a case.

As an initial matter, the threats directed at Sanchez-Benavidez are not sufficient to compel a finding of past persecution. <u>See Djonda v. U.S. Att'y Gen.</u>, 514 F.3d 1168, 1174 (11th Cir. 2008). The fact that Sandinista supporters threw rocks at and drew graffiti on his grandmother's house does not change our conclusion. Isolated instances of harassment, even when coupled with threats, are not enough to compel a finding that he suffered past persecution. <u>Delgado v. U.S. Att'y Gen.</u>, 487 F.3d 855, 861 (11th Cir. 2007) ("[P]ersecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation.") (alteration in original) (quotation marks omitted).

And although three of Sanchez-Benavidez's uncles were killed and other

11

family members were detained or harassed in the 1970s and 1980s, an applicant for asylum must do more than simply show that his family members were persecuted for their political beliefs; he must show that the same will happen to him.  See Djonda, 514 F.3d at 1176.  Sanchez-Benavidez has failed to do so here.  By his own admission, Sanchez-Benavidez's uncles and father were persecuted long before he was born because of their involvement with the Contras.  But Sanchez-Benavidez did not testify that he has or had any association with the Contras.  And his testimony did not establish that anyone in his family has been detained, beaten, or killed in recent years.  Instead, his testimony established only that he and his grandmother have been sporadically harassed and that he has been threatened.

Moreover, there is plenty of evidence in the administrative record to support the IJ and BIA's conclusion that Sanchez-Benavidez's fear of future persecution is not well-founded.  His grandmother continues to live in Nicaragua unharmed.  And Sanchez-Benavidez himself was never harmed while he lived there, despite the fact that he was threatened and despite the vandalism of his grandmother's home.

As a result, Sanchez-Benavidez has not established his eligibility for asylum. And it follows that he also has not carried the even greater burden of establishing that he was entitled to withholding of removal.[2]  D-Muhumed v. U.S. Att'y Gen.,

---

[2] Because we conclude that at least one of the BIA's grounds for denying Sanchez-Benavidez's applications for asylum and withholding of removal was supported by substantial evidence, we need not decide whether the denial could be sustained on other grounds.  For that

12

388 F.3d 814, 819 (11th Cir. 2004).

B.

Sanchez-Benavidez also contends that the BIA abused its discretion by failing to remand his case to the IJ to consider his mother's affidavit, which he submitted with his appeal to the BIA. He is mistaken. "We construe a motion to remand that seeks to introduce new evidence as a motion to reopen . . . and we review the denial of a motion to reopen for an abuse of discretion." Ali v. U.S. Att'y Gen., 643 F.3d 1324, 1329 (11th Cir. 2011) (citation omitted).[3] Despite Sanchez-Benavidez's argument to the contrary, documentary evidence cannot be submitted at any time. It is within the discretion of the BIA to deny a motion to reopen where the evidence a petitioner seeks to present on appeal was available to the petitioner at the time of his initial hearing before the IJ. See 8 C.F.R. § 1003.2(c)(1) ("A motion to reopen proceedings shall not be granted unless it appears to the Board that [the] evidence sought to be offered is material and was not available and could not have been discovered or presented at the former

---

reason, we decline to review the BIA's conclusions that Sanchez-Benavidez should have provided additional evidence to corroborate his testimony and that he failed to demonstrate he could not safely relocate within Nicaragua.

[3] At one point, Sanchez-Benavidez appears to contend that the BIA should not have construed the submission of his mother's affidavit as a motion to remand. But he does so only in passing and so has abandoned that argument. See Sapuppo v. Allsatate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

hearing . . . .").[4] There is no indication in the record that the affidavit and the information it contains could not have been obtained and presented to the IJ before he made his initial ruling. Indeed, Sanchez-Benavidez testified at the IJ hearing that he "possibly" could have asked his mother to write a letter supporting his applications. As a result, the BIA did not abuse its discretion by declining to remand Sanchez-Benavidez's case to the IJ.

## C.

Finally, Sanchez-Benavidez contends that his due process rights were violated because the BIA and IJ were biased against him. He bases this claim on the BIA and IJ's reliance on his relative lack of notoriety in Nicaragua to support their conclusion that relocation would be feasible within the country. That is not bias. The BIA and IJ merely used all the evidence in the record to draw a permissible inference that undermines Sanchez-Benavidez's claim for relief. We have ourselves relied on similar evidence in the past. See Sepulveda, 401 F.3d at 1231–32.

## IV.

We lack jurisdiction to review the IJ's denial of Sanchez-Benavidez's

---

[4] Sanchez-Benavidez's assertion, in his brief to this Court, that "reject[ing] this affidavit is just unfair, arbitrary, capricious, and in violation of due process of law" might have been intended to raise a due process or Administrative Procedure Act challenge to the BIA's decision not to allow new evidence to be presented at any time. But such a conclusory statement, unsupported by any argument or legal citation, is not sufficient to raise that issue in this Court. See Sapuppo, 739 F.3d at 681.

application for CAT relief.  The record does not compel the conclusion that Sanchez-Benavidez was eligible for asylum or entitled to withholding of removal. The BIA did not abuse its discretion by declining to remand his case to the IJ.  And Sanchez-Benavidez's due process rights were not violated.

**DENIED IN PART; DISMISSED IN PART.**